**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ELG UTICA ALLOYS, INC.,

                            Plaintiff,                      6:16-cv-1523 (BKS/ATB)

v.

NIAGARA MOHAWK POWER CORP. d/b/a National
Grid, SPECIAL METALS CORP., GENERAL ELECTRIC
COMPANY, EMPIRE RECYCLING CORP., and
CHICAGO PNEUMATIC TOOL COMPANY, LLC,

                            Defendants.

---

NIAGARA MOHAWK POWER CORP. d/b/a National
Grid,

                            Third-Party Plaintiff,

v.

CBS CORPORATION (successor-in-interest to
Westinghouse Electric Corporation),

                            Third-Party Defendant.

---

**Appearances:**

*For Plaintiff:*
David P. Flynn
David L. Cook
Robert Reagan
Phillips Lytle LLP
One Canalside
125 Main Street
Buffalo, NY 14203

*For Defendant Niagara Mohawk Power Corp. d/b/a National Grid:*
Yvonne E. Hennessey
Barclay Damon LLP
80 State Street
Albany, NY 12207

*For Defendant Special Metals Corp.:*
Doreen A. Simmons
Hancock Estabrook, LLP
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202

*For Defendant General Electric Company:*
Kristin Carter Rowe
Dean Sommer
Young/Sommer LLC
Executive Woods
Five Palisades Drive
Albany, NY 12205

*For Defendant Empire Recycling Corp.:*
Gary S. Bowitch
Law Office of Gary S. Bowitch
13 Willow Street
Castleton, NY 12033

*For Defendant Chicago Pneumatic Tool Company, LLC:*
Agnes Antonian
Connell Foley, LLP
56 Livingston Avenue
Roseland, NJ 07068

*For Third-Party Defendant CBS Corporation (successor-in-interest to Westinghouse Electric Corporation):*
Marc J. Felezzola
James D. Mazzocco
Babst, Calland, Clements & Zomnir, P.C.
Two Gateway Center
603 Stanwix Street, 8th Floor
Pittsburgh, PA 15222

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff ELG Utica Alloys, Inc. brings this action asserting claims under the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980

("CERCLA"), 42 U.S.C. §§ 9601–9675; under Article 12 of the New York Navigation Law; and

2

for contribution under the New York Civil Practice Law and Rules ("CPLR") and New York common law. (Dkt. No. 43 (amended complaint)). Plaintiff seeks response costs and damages arising out of the release or threatened release of hazardous substances at "the Universal Waste Site," which "operated as a metal recycling operation" in Utica, New York from the 1950s until 2012. (*Id.* ¶¶ 1–2). Plaintiff seeks to hold Defendants Niagara Mohawk Power Corp. d/b/a National Grid ("National Grid"), Special Metals Corp. ("SMC"), General Electric Company ("GE"), Empire Recycling Corp. ("ERC"), and Chicago Pneumatic Tool Company, LLC ("CP") liable for their share of approximately $6,700,000 in "past response costs and other damages . . . incurred from 2012 to date" and "future response costs and damages." (*Id.* ¶¶ 1, 9).

Presently before the Court is the joint motion of Defendants and Third-Party Defendant CBS Corporation (successor-in-interest to Westinghouse Electric Corporation) ("CBS") for summary judgment and spoliation sanctions pursuant to Rules 56 and 37 of the Federal Rules of Civil Procedure. (Dkt. No. 246).[1] The motion is fully briefed. (*See* Dkt. Nos. 247–258, 264, 265). For the following reasons, the Court grants Defendants' motion for spoliation sanctions but defers selection of the sanction, and grants Defendants' motion for summary judgment.

## II.      BACKGROUND

### A.      Facts Relating to Defendants' Summary Judgment Motion[2]

#### 1.      Site Background

The Universal Waste Site at issue in the complaint is an approximately 20-acre parcel of land located in Utica, New York near the intersection of Leland and Wurz Avenues. (Dkt. No.

---

[1] For purposes of this decision, the Court refers collectively to the Third-Party Defendant and all Defendants as "Defendants." The Court authorized Defendants to "proceed with one joint, early dispositive motion" which would address "only statute-of-limitation defenses, plaintiff's CERCLA contribution claim, and defense spoliation claims." (Text Minute Entry dated Apr. 18, 2022); *see also* Fed. R. Civ. P. 14(a)(2)(C) (providing that a third-party defendant "may assert against the plaintiff any defense that the third-party plaintiff has to the plaintiff's claim").

[2] The facts are drawn from Defendants' Joint Statement of Undisputed Material Facts, Plaintiff's Statement of Additional Material Facts, and the parties' respective responses, (Dkt. Nos. 246-2, 264, 264-1, 265-1, 265-2), to the

246-2, ¶ 1; Dkt. No. 264, ¶ 1; Dkt. No. 265-1, ¶ 1). The Universal Waste Site at issue is part of a 23-acre parcel of land owned by Plaintiff ("the full Site" or "the Site"), which in 1998 was administratively bifurcated to facilitate the remediation of approximately 1.5 acres of the Site. (The 1.5-acre parcel was designated the "Utica Alloys, Inc." Site.) The 23-acre Site is in close proximity to the Mohawk River and "located in a flood plain." (Dkt. No. 253-5, at 2; *see also* Dkt. No. 253-9, at 5).

As relevant here, Utica Alloys, Inc. and Universal Waste, Inc. (together, "the Companies") conducted operations at the full Site, including scrap recycling operations. (*See* Dkt. No. 246-2, ¶ 2; Dkt. No. 264, ¶ 2; Dkt. No. 43, ¶ 2 (alleging that the "Site operated as a metal recycling operation from at least the 1950s until 2012")). Utica Alloys, Inc. was formed to "deal in, buy, sell and process all high and low temperature alloys . . . ; to operate vacuum melt furnaces, found[]ries and deal generally in reclamation of alloys; [and] to process all non-ferrous metals." (Dkt. No. 252-4, at 2). Universal Waste, Inc. was formed to "buy, sell, reclaim, manufacture, convert and deal in waste metal, waste paper, rags, iron, steel, [and] non-ferr[o]us metals." (Dkt. No. 252-5, at 2; *see also* Dkt. No. 253-9, at 4 ("Universal Waste, Inc. is engaged in the buying and selling of paper, metal, and other waste materials. Utica Alloys, Inc. is engaged in the buying, selling, processing, and reclaiming of high- and low-temperature alloys, and non-ferrous metals.")). The Companies had the same voting stockholder, officers, and directors; used the same buildings and areas at the Site; and shared Site costs. (Dkt. No. 246-2, ¶ 3; Dkt. No.

---

extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The Court does not consider the declarations of Attorneys Yvonne E. Hennessey, Kristin Carter Rowe, and David Flynn, (Dkt. Nos. 247, 252, 264-2, 265-3, 265-4), to the extent those attorney declarations relate to Defendants' motion for summary judgment and consist of attorney argument or characterization of the record evidence. *See, e.g., Fed. Trade Comm'n v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) (declining to consider the "legal arguments and factual allegations contained within the [attorney] declaration" where the declaration went "beyond the introduction of documents and veer[ed] into legal argument and factual allegations for which [the attorney] ha[d] no personal knowledge"). The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

264, ¶ 3). Since at least 1984, the 23-acre Site has been owned by the same company. (*See* Dkt. No. 252-10 (1984 indenture transferring the property to Clearview Acres Limited, Inc. ("Clearview") and 1984 leases of the property to the Companies)); *see infra* Section II.A.7 (detailing 2008 sale of property to Plaintiff).

### 2.      1977 Discovery of Contamination at the Site and 1979 Response

In a July 19, 1977 letter to Universal Waste following an inspection of the Site, the New York Department of Environmental Conservation ("NYSDEC") expressed "concern" with "the handling of electrical components such as transformers and capacitors, and . . . the possible discharge of solvents from [Universal Waste's] degreasing operation." (Dkt. No. 253-2, at 2). NYSDEC noted that large transformers and capacitors "may be filled with" polychlorinated biphenyls ("PCBs"), a harmful substance. (*Id.*). NYSDEC sampled the soil in the vicinity of the stockpile of transformers and capacitors and noted that "positive action will have to be taken" if PCBs were detected. (*Id.*). Analysis of the samples taken revealed the presence of PCBs and trichloroethylene ("TCE"), another harmful substance. (Dkt. No. 253-3 (memorandum dated March 30, 1979 enclosing laboratory results)). The EPA inspected the Site on October 24, 1979, and in a "potential hazardous waste site identification and preliminary assessment," noted concerns about PCBs on the Site; the EPA reported that "remedial activity" in the form of soil removal was being performed. (Dkt. No. 253-4, at 16–19).

In late 1979, after requesting and receiving information from NYSDEC regarding the logistics of off-site disposal, Universal Waste removed both PCB-contaminated capacitors and transformers and contaminated soil from the Site for disposal. (*See generally* Dkt. No. 253-4). Universal Waste entered into a contract with Newco Chemical Waste Systems, Inc. for the transportation and disposal of "[w]astes containing PCB's," including "capacitors, properly drained transformers, contaminated soil . . . [and] properly drained containers (drums)." (*Id.* at 8–

11). A straight bill of lading dated November 27, 1979 indicates that Newco transported 22 "PCB Article containers (drums)" weighing 3598.18 kilograms. (*Id.* at 12–13). An entity called CECOS International Inc. subsequently informed NYSDEC that it "accepted twenty-two (22) drums of PCB material" from Universal Waste at its Niagara Falls site and disposed of the material on December 1, 1979. (*Id.* at 20).

On November 26, 1979, a representative from the United States Environmental Protection Agency ("EPA") wrote to a United States Congressman in response to an inquiry concerning the Site. (*Id.* at 14). The EPA noted that NYSDEC was "aware of the [contamination] problem" and that the "present owners are working with NYSDEC officials in having the contaminated material moved to a secure location." (*Id.*). There did "not appear to be a threat to the Mohawk River" or "evidence of leaching or any movement of the contaminated soil." (*Id.*).

### 3.       1980s: Registry Listing, 1982 Agreement, and Clayton Study

In 1980, the full 23-acre Site was listed on the New York State Registry of Inactive Hazardous Waste Disposal Sites (the "Registry"). (Dkt. No. 253-5, at 1–3). The Site was called "Universal Waste, Inc." and given a site code of 633009. (*Id.* at 2). NYSDEC noted that its "environmental inspection team d[id] not believe that the Universal Waste site pose[d] an 'imminent health hazard' to water supplies or the surrounding area" and that remedial action had been "[p]roposed." (*Id.* at 3).

In March 1981, counsel for the Companies wrote to NYSDEC "hop[ing]" that NYSDEC was satisfied that "no hazardous waste problem [wa]s presented" by the Site and requesting that the Site be deleted from the Registry. (Dkt. No. 253-6, at 2). Attorney Vincent Rossi represented that the Companies had "never had a disposal site on [the] premises." (*Id.*).

In a letter dated January 7, 1982, NYSDEC wrote to Joseph Jiampietro, President of the Companies, stating that the agency was "continuing to investigate the disposal of hazardous or

industrial wastes and materials at the approximately 23 acre Universal Waste/Utica Alloys Site."
(Dkt. No. 253-7, at 2). NYSDEC stated that, after its investigation, it would determine "whether
any further action should be taken concerning the site." (*Id.*). NYSDEC's letter "constitute[d] a
formal request" pursuant to New York state law for the Companies to furnish a range of
specified documents and records relating to the Site. (*Id.* at 2–4).

In August 1982, the Companies and NYSDEC entered into an Agreement and
Determination (the "1982 Agreement"). (Dkt. No. 253-8). The Companies agreed to conduct a
"field investigation" and provide a "field investigation report, with the goal of identifying any
threat to the environment posed by the prior disposal of industrial and hazardous wastes at and in
the vicinity of the Site." (*Id.* at 3). To accomplish this goal, the Companies retained Clayton
Environmental Consultants, Inc. ("Clayton"), who investigated the 23-acre Site in 1983 and
issued a revised Waste Management Study report on March 21, 1984 (the "Clayton Study"). (*See*
Dkt. No. 253-9). The Clayton Study recounted that "PCB electrical equipment" previously
deposited at the Site was "cleaned up in conformance with N.Y.D.E.C. regulations shortly after
discovery of the spilled material." (*Id.* at 4). The investigation involved sampling and analysis of
groundwater, surface soil, sewers, sediment, and ambient air. (*See id.* at 8–33). Generally, the
Clayton Study found the continued presence of PCBs and TCE at the Site. (*Id.* at 11–12, 34–35).
Clayton concluded that "[c]ontaminated surface soil in well-defined areas is present on the Utica
Alloys property. Immediate action is called for in the PCB-contaminated area . . . to prevent
possible excessive exposure to onsite personnel." (*Id.* at 36). There was "no indication of
hazardous wastes having been buried onsite." (*Id.*). While the "groundwater under the property is
contaminated with PCBs" and other contaminants, Clayton could not determine the "degree to

which the Utica Alloys operations have contributed to this contamination." (*Id.*). Clayton found

"no immediate health hazard posed by the [observed] groundwater contamination." (*Id.*).

In March 1986, NYSDEC sought a summary enforcement order which would require

Clearview and the Companies to "develop and implement an inactive hazardous waste disposal

site remedial program and pay the Department's administrative costs related to the inactive

hazardous waste disposal site," "bring [the] facility into compliance" with New York regulations,

and "pay a penalty for the cited violations of such regulations." (Dkt. No. 254, at 3–4). Later that

month, Mr. Jiampietro wrote to New York Governor Mario Cuomo requesting his office's

involvement. (Dkt. No. 254-1). Mr. Jiampietro represented that the Companies had been

"studying" the Site's "PCB hot spots" and "traces" of TCE "for the past 5 years" and that the

conditions were not "new." (*Id.* at 2). He noted that the Companies had "spent nearly $500,000[]

on anti-pollution environmental equipment, engineering studies, clean-ups and legal fees." (*Id.*).

In April 1986, Mr. Jiampietro submitted a sworn affidavit in opposition to NYSDEC's motion

for a summary order. (Dkt. No. 254-2). Mr. Jiampietro generally argued that the source of the

TCE contaminant was upgradient of the Site and requested that NYSDEC "implead the source of

PCB's (and TCE)." (*Id.* at 5–6).

In May 1986, NYSDEC reclassified the Universal Waste Site on the Registry, changing

the Site's code from a "2a to a 2 effective January 1, 1986." (Dkt. No. 253-5, at 4–5). Under

New York Environmental Conservation Law, a Class 2 site is one which poses a "significant

threat to the public health or environment – action required." (*Id.* at 4); *see* N.Y. Env't Conserv.

Law § 27-1305(2)(b)(2). By letter dated June 27, Clearview and the Companies requested that

NYSDEC "de-list or reclassify" the Site. (Dkt. No. 254-3). Their counsel stated that they "have

taken all reasonable steps necessary to thoroughly investigate and remediate this highly

industrialized site," including "the surface removal, proper disposal of PCBs with the approval

and co[n]currence of [NYSDEC] personnel," "implementation of a hazardous waste [TCE]

sludge treatment program," and arranging for the Clayton Study. (*Id.* at 2). NYSDEC denied this

petition for reclassification or delisting. (Dkt. No. 254-4).

In 1989, the Companies moved to join "several additional parties," including Defendants

SMC and GE, to NYSDEC's enforcement action regarding the Site. (*See* Dkt. No. 254-5, at 3–

4). In denying this request, NYSDEC noted that the Companies "may seek relief against" the

parties they sought to join "in a separate [CPLR] contribution action." (*Id.*).

### 4.    The 1990s

In an internal NYSDEC memorandum dated November 19, 1991, the agency summarized

the history of the 1982 Agreement and the 1986 enforcement action. (Dkt. No. 254-9, at 2).[3]

NYSDEC stated that the hearing initiated by the 1986 enforcement action had not been resolved

and "seem[ed] no closer to being resolved today than in 1986." (*Id.*). The agency noted that the

Companies were not willing to conduct a remedial investigation/feasibility study ("RI/FS")

"without a number of other parties being involved" and recommended that the State conduct its

own RI/FS. (*Id.* at 2–3). NYSDEC stated that the Site was "high on the region 6 list of priority

sites" but not an "imminent threat." (*Id.* at 3).

In an April 1992 memorandum written by the Companies' counsel,[4] Attorney Michael

Gerrard noted that the Companies "operate a scrap metal processing facility and allied operations

in Utica." (Dkt. No. 254-10, at 2). He also noted that Mr. Jiampietro "would like to [] delay the

---

[3] There is some evidence in the record that additional soil excavation and removal may have occurred at the Site sometime in 1989 or 1990. (*See* Dkt. Nos. 254-7, 254-8).

[4] Attorney Rowe states that while this memorandum is "arguably privileged or protected material," Plaintiff "willingly produced at least five (5) different copies of it in this litigation" on separate occasions and did not respond when defense counsel inquired if Plaintiff would like to claw back the document. (Dkt. No. 252, ¶ 51 n.1).

investigation and remediation of the site as long as possible." (*Id.* at 4). In July 1992, Attorney

Gerrard wrote to NYSDEC denying the agency access to the Site "for the purpose of beginning

the RI/FS process,"[5] noting that the Companies had appealed to the NYSDEC Commissioner in

an effort to stop the RI/FS. (Dkt. No. 254-12).

In November 1993, NYSDEC's Director of the Division of Environmental Enforcement

told Attorney Gerrard that a "supplemental investigation" of the Site "rather than an RI/FS" was

"called for under the current circumstances." (Dkt. No. 254-13, at 2). This letter references the

1989 removal of "two 'PCB hot spots'" and asserted that "[a]ny such discreet remedial actions

that were taken did not occur with any Departmental oversight and the impact of such actions on

site conditions must be evaluated." (*Id.*). The results of the supplemental investigation would

"determine what, if any, further steps should be taken both on and off-site." (*Id.* at 3). In

December, the Companies expressed willingness to "conduct an investigation of the property on

which they operate" and supported NYSDEC's proposal to "design an investigation of [] offsite

sewers, groundwater and surface water." (Dkt. No. 255, at 2).

On October 12, 1995, NYSDEC, the Companies, and Clearview entered into an Order on

Consent (the "1995 Consent Order") pursuant to which the Companies and Clearview agreed to

develop and implement a "Supplemental Investigation . . . which will gather data to enable the

Department to characterize hazardous substances and hazardous wastes which are or may be

present on the Utica Alloys portion of the Site." (Dkt. No. 255-5, at 2–3). The supplemental

investigation was to be performed in accordance with a Department-approved work plan that was

incorporated into the Consent Order. (*Id.* at 3–4).

---

[5] It appears that NYSDEC had contacted the Companies to inform them that a NYSDEC contractor "for the RI/FS" would be visiting the Site on August 5, 1992 "to view the site and begin making preparations for the first phase of the remedial investigation." (Dkt. No. 254-12, at 2).

In 1996, the Companies excavated between 25 and 35 tons of contaminated soil for off-site disposal. (*See generally* Dkt. No. 255-6). In July 1996, NYSDEC provided comments on the Companies' Supplemental Investigation Report prepared pursuant to the 1995 Consent Order. (Dkt. No. 255-7). NYSDEC concluded that "the Universal Waste/Utica Alloys site is the source of contamination of PCBs and TCE in the municipal sewer and groundwater." (*Id.* at 2; *see id.* at 3 ("[T]he Department concludes that the Utica Alloys facility is contaminated with TCE & PCBs and that contamination is not coming from off site.")). NYSDEC indicated that Clearview and the Companies would need to conduct a RI/FS "as soon as possible." (*Id.* at 3). NYSDEC "suggest[ed] a single RI/FS of the whole site," but stated that it "would be open to th[e] possibility" of "a supplemental site investigation on the Universal Waste portion first" if they preferred. (*Id.*).

In connection with a trommeling project in 1997 and a sewer line project in 1998 at the Site, Universal Waste and/or Utica Alloys excavated additional PCB-contaminated soil and disposed of it off-Site. (*See generally* Dkt. Nos. 255-8, 255-9; Dkt. No. 246-2, ¶¶ 31–32; Dkt. No. 264, ¶¶ 31–32).

### 5.    1998 Administrative Bifurcation of the Site

In an April 1994 letter to NYSDEC, counsel for the Companies requested that the agency "bifurcate the investigation of the Site, so that the investigation and cleanup of the Utica Alloys portion of the Site can proceed swiftly to cleanup and delisting." (Dkt. No. 255-1, at 3). In an internal memorandum dated September 13, 1995, NYSDEC indicated that it "ha[d] no problem with a phased approach" that would address the Utica Alloys portion of the Site first, "as long as [the agency] ha[d] some assurance that the second phase (investigation of the Universal Waste portion of the site) will actually take place in a timely manner." (Dkt. No. 255-3, at 2; *see also*

Dkt. No. 255-4, at 2 (NYSDEC memorandum indicating that staff had agreed to a proposed consent order for the "Utica Alloys parcel" portion of the Site)).

By letters dated August 7, 1998, NYSDEC confirmed that it would separately list the "Utica Alloys portion of the Universal Waste Site" on the Registry. (*See* Dkt. No. 255-13). The new site consisting of the Utica Alloys portion of the full 23-acre Site, which was estimated to be 1.5 acres, was named "Utica Alloys, Inc.," given a site code of 633047, and given a class code of 2 (the "Utica Alloys Site"). (*Id.* at 2–4). NYSDEC noted that the Utica Alloys "section of the site is being listed as a separate site in order to facilitate an independent remediation of this property." (*Id.* at 4). NYSDEC noted: "High concentrations of [TCE] have been found in both groundwater and the soils at this site. PCBs have also been detected above the concentrations required for soil cleanup objectives. The TCE concentrations in the vicinity of the former storage tank are a potential source of ongoing groundwater contamination." (*Id.*). The "Universal Waste, Inc." site with the original 633009 site number consequently consisted of "the remainder of the original site" (the "Universal Waste Site"). (*Id.* at 7). At the time of the Site's bifurcation, NYSDEC "delay[ed] making a determination regarding the level of threat posed by The Universal Waste site pending a planned Preliminary Site Assessment" and gave the Universal Waste Site a class code of 2a. (*Id.*); *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 218 n.2 (2d Cir. 2014) ("*NYSEG*") ("Class 2a is a temporary classification assigned to a site that has had inadequate and/or insufficient dat[a] for inclusion in any of the other classifications.").

### 6.      1999 Consent Order and Early 2000s

On September 24, 1999, NYSDEC, Utica Alloys, and Clearview entered into an Order on Consent regarding the Utica Alloys Site (the "1999 Consent Order"). (Dkt. No. 255-14). Utica Alloys and Clearview agreed to conduct an RI/FS which had been approved by NYSDEC. (*Id.* at

2–3). As part of the feasibility study, Utica Alloys and Clearview were required to "evaluat[e]" on-Site and off-Site remedial actions to eliminate, to the maximum extent practicable, all health and environmental hazards and potential hazards at the [Utica Alloys] Site." (*Id.* at 4). They also agreed to conduct possible Interim Remedial Measures ("IRMs") pending selection of a "final remedial alternative for the Site." (*Id.* at 5).

On May 9, 2000, NYSDEC, Universal Waste, and Clearview entered into an Order on Consent regarding the Universal Waste Site (the "2000 Consent Order"). (Dkt. No. 256). Pursuant to this consent order, Universal Waste and Clearview agreed to conduct a Preliminary Site Assessment ("PSA") of that Site in accordance with a Department-approved work plan. (*Id.* at 2–3). The 2000 Consent Order noted that "the presence of PCBs in the Site's soils" had been "confirm[ed]," and that the goal of the PSA was to "gather data to enable the Department to characterize hazardous wastes which are or may be present at the Site and to enable the Department to determine whether such wastes constitute a significant threat to public health or the environment necessitating remediation." (*Id.*).

### a.    2002 Soil Disposal

In June 1999, Universal Waste informed NYSDEC that it "plan[ned] to erect a new building" at its Site and do "sampling to verify that the area under the pad is not contaminated." (Dkt. No. 256-1, at 2). "PCBs were detected in seven of the 10 samples" taken. (Dkt. No. 264-3, at 2). The company who did the sampling and analysis concluded that the "low levels of PCBs in the soil do not represent a significant threat, although two of the samples d[id] exceed a regulatory limit." (*Id.*). Nearly two years later, in April and May 2002, approximately 515 tons of contaminated soil were transported and disposed of off-Site. (*See* Dkt. No. 256-2, at 2 (purchase order for the loading of hazardous soils, transportation, and disposal dated April 18, 2002); Dkt. No. 256-3 (hazardous waste manifests dated between May 1 and 7, 2002 for the transportation

and off-Site disposal of 515 tons of soil)). The waste manifests indicate that the soil was
contaminated with chromium and lead. (*See generally* Dkt. No. 256-3).

In August 2003, NYSDEC invoiced Universal Waste for $40,000 in regulatory fees for
the generation of more than 500 tons of hazardous waste for the years 2002 and 2003. (Dkt. No.
256-4, at 2–5). Bret Copple of Utica Alloys, acting on behalf of Universal Waste, disputed the
fees charged on the ground that "the waste soil removal from the Universal Waste site should in
fact fall under the criteria for exemption as remediation of an inactive waste disposal site in New
York State" and that the "soil removal in 2002 was a one-time event." (*Id.* at 6–15). NYSDEC
ultimately revised its invoice and eliminated the $40,000 fee, holding that the Universal Waste
Site "is an exempt remedial site not subject to base regulatory fees." (*Id.* at 16–17).

### b.    2007 Soil and Groundwater Disposal

In a September 2007 Fact Sheet, NYSDEC described the IRMs to be implemented at the
Utica Alloys Site (633047). (Dkt. No. 256-8; *see id.* at 2 (indicating that a "Remedial
Investigation and Interim Remedial Measures Alternative Analysis program was initiated in
1999")). The IRMs were conducted pursuant to the 1999 Consent Order. (*See* Dkt. No. 258, at 6;
*see also* Dkt. No. 256-7, at 3 (June 9, 2003 letter from consultant Stearns & Wheler, LLC
regarding the planning of the IRMs and noting that PCB "hot spots" "on the south and east sides
of the concrete pad at the south side of the building" would be excavated)). Generally, the
objectives of the IRMs were to "[r]emove soil containing PCBs from seven areas previously
identified in the outside storage area of the facility that are in excess of the recommended soil
cleanup objectives," "[r]emove soil above the water table in the vicinity of the former TCE
storage tank containing elevated concentrations of TCE and associated [volatile organic
compounds]," and "[m]onitor ground water quality in the vicinity of the former TCE storage
tank to assess ground water quality changes as a result of the soil removal actions." (Dkt. No.

256-8, at 3). It is undisputed that Utica Alloys excavated 715 tons of PCB- and TCE-

contaminated soil for off-site disposal in December 2007. (*See* Dkt. No. 257 (hazard waste

manifests)). Utica Alloys also pumped 6,951 gallons of contaminated groundwater for transfer

and off-site disposal. (Dkt. No. 258, at 10, 12). The excavations "were backfilled to original

grade using 701 tons of crusher run." (*Id.* at 11).

According to Defendants, four of the seven PCB soil areas that were excavated,

stockpiled, transported, and disposed of off-site were in fact located on the Universal Waste Site,

not the Utica Alloys Site. (Dkt. No. 246-2, ¶¶ 47–48). Consultants O'Brien & Gere prepared an

Interim Remedial Measures Report dated December 2010 to "summarize[] IRM activities

completed" for the Utica Alloys property in accordance with the Work Plan approved by

NYSDEC pursuant to the 1999 Consent Order. (Dkt. No. 258, at 6). The report contains a figure

indicating the location of the seven PCB areas, (*id.* at 8, 21), as well as a figure indicating the

location of where the soil was stockpiled before it was ultimately removed from the property, (*id.*

at 9, 23). When compared with a 2013 survey indicating the boundary lines of each site, (Dkt.

No. 258-14, at 2),[6] it appears that three of the seven PCB soil areas that were excavated in 2007

(areas B, C, and D) were located on the Universal Waste Site, and that all of the PCB- and TCE-

contaminated soil was stockpiled on the Universal Waste Site prior to its transport and off-site

disposal. (*Compare* Dkt. No. 258, at 21, 23, *with* Dkt. No. 258-14, at 2). Plaintiff argues that the

excavated soil came entirely from the Utica Alloys Site, (*see* Dkt. No. 264, ¶ 47 (noting that the

---

[6] While there appears to have been some uncertainty regarding the precise boundaries of the Utica Alloys Site after the bifurcation, (*see* Dkt. Nos. 258-11, 258-12, 258-13), the boundary line issue was definitively resolved by a 2013 survey, (Dkt. No. 258-14; Dkt. No. 264, ¶ 66).

IRM report pertained solely to the Utica Alloys Site)), but does not argue that the figures and survey Defendants point to are erroneous.[7]

In 2008, NYSDEC invoiced Utica Alloys for $206,000 in regulatory fees for the generation of more than 500 tons of hazardous waste per year. (Dkt. No. 258-1). Utica Alloys challenged the agency's fee determination, again claiming an exemption "because the hazardous waste was generated in the remediation of an inactive hazardous waste disposal site subject to an administrative consent order and with the approval of the NYSDEC." (Dkt. No. 258-2, at 2–3). NYSDEC subsequently determined that Utica Alloys was exempt from the fees because "[h]azardous wastes generated at this site in 2007 are exempt remedial wastes from a State Superfund Site (633047)." (Dkt. No. 258-3).

### 7. The 2008 Transaction

In June 2008, ELG Haniel GmbH, a German corporation, purchased the stock of Clearview and the Companies (among other entities). (Dkt. No. 252-1 (Securities Purchase Agreement dated June 30, 2008)). The Securities Purchase Agreement listed among environmental matters the "investigation and remediation of hazardous waste" at the Universal Waste property and referenced the pending enforcement proceeding before NYSDEC (citing site number 0633009). (*Id.* at 67). In August, Clearview and the Companies were merged into Utica Alloys, Inc. (Dkt. No. 252-2 (Certificate of Merger dated August 11, 2008)). Utica Alloys, Inc. changed its name to "ELG Utica Alloys, Inc."—the Plaintiff in this action—in September 2008. (Dkt. No. 252-3 (Certificate of Amendment of the Certificate of Incorporation)).

---

[7] In any event, the resolution of this dispute is not determinative to the Court's decision.

### 8.      Reclassification Petition and Decision

In July 2002, NYSDEC changed the classification of the Universal Waste Site from Class

2a to 2. (Dkt. No. 256-5, at 2). In doing so, NYSDEC referenced the discovery of PCBs on the

Site going back at least as far as 1996 and concluded that the PCBs "disposed at the Universal

Waste site present a significant threat to the environment" such that remedial action was

necessary. (*Id.*). Universal Waste had proposed "capping a one acre area with asphalt as an

Interim Remedial Measure." (*Id.*). In 2003, Universal Waste and Clearview petitioned NYSDEC

to "delete the Site" from the Registry or, alternatively, to "have the site reclassified as Class 3."

(*Id.* at 7); *see* N.Y. Env't Conserv. Law § 27-1305(3) (defining a Class 3 site as one which

"[d]oes not present a significant threat to the public health or environment—action may be

deferred"). After NYSDEC summarily denied the petition, (Dkt. No. 256-5, at 25), New York

Supreme Court ordered that an administrative hearing on the petition held, *Universal Waste, Inc.*

*v. NYSDEC*, 778 N.Y.S.2d 855, 862 (Sup. Ct. Oneida Cty. 2004);[8] (*see* Dkt. No. 256-5, at 27–30

(notice of hearings)).

The NYSDEC Commissioner issued a decision on October 15, 2011, denying the 2003

petition to reclassify the Universal Waste Site on the Registry. (*See generally* Dkt. No. 258-5).

The Commissioner found that Universal Waste "failed to carry its burden of proving by a

preponderance of the evidence that its site does not present a significant threat to the public

health or the environment" and therefore that the Site should remain classified as Class 2. (*Id.* at

35). Plaintiff filed an Article 78 petition in state court challenging the Commissioner's decision.

(Dkt. No. 258-6 (first page of notice of petition filed February 14, 2012)). On April 10, 2014, the

---

[8] The state court noted in its decision that the "delay that has surrounded the assessment and remediation of this site
is nothing short of mind boggling." 778 N.Y.S.2d at 862.

Appellate Division, Third Department affirmed the Commissioner's decision. *ELG Utica Alloys, Inc. v. Dep't of Envt. Conservation*, 983 N.Y.S.2d 668 (3d Dep't 2014).

### 9.     2012 Notice Letter and Consent Order

After Plaintiff filed its petition to challenge the Commissioner's decision denying the reclassification petition, NYSDEC sent Plaintiff a Notice Letter dated June 7, 2012 concerning the Universal Waste Site (the "2012 Notice Letter"). (Dkt. No. 258-7). NYSDEC informed Plaintiff that it had determined that Plaintiff, as "successor-by-merger" of Clearview and the Companies, was a "responsible party for the site's contamination." (*Id.* at 3). NYSDEC based this determination on "the ownership of the site and adjacent areas by ELG and/or Clearview" and "the long-term operation of the site by Universal Waste, Inc. and/or Utica Alloys, Inc." (*Id.*). NYSDEC stated that it was also sending Notice Letters to other potentially responsible parties ("PRPs"), including Defendants SMC and National Grid. (*Id.*). NYSDEC requested that Plaintiff "develop, implement, and finance a Remedial Program" for the Universal Waste Site. (*Id.*). The letter noted that NYSDEC "began investigating the disposal of PCBs at the site in the late 1970s" and that the Companies had "conducted limited investigations, but ha[d] been unwilling to conduct an RI/FS," and requested that an RI/FS be undertaken "in the immediate future." (*Id.* at 3–4 (emphasis omitted)). The 2012 Notice Letter attached a draft Order on Consent and Administrative Settlement and required Plaintiff to provide a number of records relating to the Universal Waste Site and its history, operations, and handling of hazardous wastes. (*See id.* at 4, 8–23).

Counsel for Plaintiff acknowledged receipt of the 2012 Notice Letter. (Dkt. No. 258-8). As part of Plaintiff's "interim response," it requested copies of any notice letters which were sent to any other PRPs. (*Id.* at 3 ("Please send us copies of any Notice Letters which have been sent to any person regarding the Site or the Mohawk River in the vicinity of the Site." (internal

footnote omitted))). Plaintiff also expressed "surprise[]" with NYSDEC's determination that an RI/FS must be conducted "in the immediate future." (*Id.* at 4). By letter dated July 20, 2012, NYSDEC denied another request to reclassify the Universal Waste Site as a Class 3 site. (Dkt. No. 258-9, at 2). NYSDEC indicated that it "has been attempting since 1977 to ensure that the site is properly addressed" but the Universal Waste Site "and its impacted areas have not been fully remediated at this point solely because Universal Waste spent all these years blocking the Department's forward efforts in one way or another." (*Id.* at 3).

NYSDEC and Plaintiff entered into an Order on Consent and Administrative Settlement for the Universal Waste Site in November 2012 (the "2012 Consent Order"). (Dkt. No. 258-10). Pursuant to the 2012 Consent Order, Plaintiff agreed to conduct a "limited on-Site Remedial Investigation" of the Site. (*Id.* at 2–6).

### 10.   2015 Consent Order and Subsequent Site Activity

Plaintiff and NYSDEC entered into another Order on Consent and Administrative Settlement for the Universal Waste Site in October 2015 (the "2015 Consent Order"). (Dkt. No. 258-15). Plaintiff agreed to perform an RI/FS at the Universal Waste Site and perform IRMs at the Universal Waste Site. (*Id.* at 5). In September 2016, NYSDEC approved the Limited On-Site Remedial Investigation Report that Plaintiff submitted pursuant to the 2012 Consent Order and, based on Plaintiff's representation that the approved RI/FS work plan would be carried out pursuant to the 2015 Consent Order, terminated the 2012 Consent Order. (Dkt. No. 264-4, at 2).

Consultant EHS Support prepared an "Interim Remedial Measure Construction Completion Report – Revision 1" dated March 2019 which summarizes the implementation of IRMs at the Universal Waste Site. (Dkt. No. 258-16). The report "document[ed] the removal and off-site disposal of seventeen (17) debris piles and a soil berm" as an IRM at the Universal Waste Site. (*Id.* at 8). The debris piles and soil berm "were removed to facilitate completion of

the surface and subsurface investigation required as part of the RI/FS" under the 2015 Consent

Order. (*Id.*). The report noted that PCBs "have been identified and are a constituent of potential

concern" for "Site soil." (*Id.*). As part of the IRM, 13,393 tons of hazardous soil and debris were

transported for off-Site disposal. (*Id.* at 16). Work has continued at the Universal Waste Site.

(*See generally* Dkt. No. 264-5 (July 2020 EHS Support report entitled "Supplemental Remedial

Investigation Work Plan for Operable Units 1 and 3 – Revision 1")).

### B.     Procedural History

Prior to commencement of this action, Plaintiff and National Grid entered into two

separate agreements which tolled the statute of limitations from June 1, 2015 to June 1, 2016 and

then from July 15, 2016 to December 30, 2016. (Dkt. Nos. 251-2, 251-3). Plaintiff and SMC also

entered into a tolling agreement which tolled the limitations period from December 7, 2015 to

October 31, 2016. (Dkt. No. 251-4). Plaintiff commenced this action against Defendant National

Grid on December 22, 2016. (Dkt. No. 1). On December 10, 2018, Plaintiff filed an amended

complaint and brought suit against SMC, GE, ERC, and CP. (Dkt. Nos. 42, 43). National Grid

brought a third-party complaint against CBS on January 31, 2019. (Dkt. No. 69).

### C.     Facts Relating to Defendants' Spoliation Motion[9]

In March 2021, Plaintiff informed Defendants that historic records relating to the Site

were stored in a storage room at Plaintiff's Herkimer, New York location, including

"approximately 300 boxes on pallets." (Dkt. No. 247-1, at 3). Plaintiff later informed the Court

that it "reviewed more than 700 large bankers boxes from the 1980s through 2010 over the

course of six days" and identified "69 historic invoices" relevant to this litigation. (Dkt. No. 213,

---

[9] These facts are largely drawn from the declaration of Attorney Hennessey, counsel to National Grid, to the extent those facts have not been disputed, and other evidence in the record including deposition testimony. (Dkt. Nos. 247, 248, 249, 250, 251). Although Defendants' submissions refer to numerous alleged discovery violations on the part of Plaintiff, the Court focuses its recitation of facts and analysis to the destruction of documents at issue.

at 2). Concerned about Plaintiff's "apparent perfunctory review of the Herkimer storage room," Defendants requested that the Court grant them direct access to the room to conduct their own review. (Dkt. No. 247, ¶ 31 (citing Dkt. Nos. 211, 212)). After a conference and in accordance with the proposal of Magistrate Judge Andrew T. Baxter, Defendants served a Notice of Rule 30(b)(6) Deposition to take the deposition of an individual who could testify about the operations and document removal practices at the Herkimer storage room, the nature of the documents stored in the room, and the document review process carried out by Plaintiff there. (Dkt. No. 247, ¶¶ 32–37; Dkt. No. 247-3).

On July 15, 2021, Defendants deposed William Kinsella, Assistant Comptroller for Plaintiff, who works in Herkimer. (Dkt. No. 247-4 (7/15/2021 Kinsella deposition transcript)).[10] While Mr. Kinsella was not present for and therefore could not testify as to Plaintiff's recent review of documents in the Herkimer storage room, (*see id.* at 27–30), he testified as to the transfer of documents from other locations to the Herkimer storage room and the storage and preservation of documents in Herkimer, (*id.* at 16–24). When asked if he was aware of any documents being destroyed since their arrival in Herkimer, Mr. Kinsella testified that, in or around 2013, "[t]here were pallets from . . . the warehouse, the storage facilities, and Germany [presumably referring to a representative of Plaintiff's German corporate owner] went through them and deemed some of them not of any relevance." (*Id.* at 25). Mr. Kinsella accompanied the German representative to the storage room but could not identify the individual. (*Id.* at 37). Mr. Kinsella did not know "what was in the boxes" that were marked for destruction and ultimately "sent out," and he testified that "100 [boxes], more towards that number than a couple" were

---

[10] Prior to this deposition, two counsel for Defendants "walk[ed] through the storage room, accompanied by Plaintiff's counsel." (Dkt. No. 247, ¶ 43). The walk-through "revealed that boxes appeared to be primarily labeled and organized according to date," including "several boxes" that were clearly labeled "2008 Transaction." (*Id.* ¶¶ 43–44).

destroyed. (*Id.* at 38–39; *see also id.* at 51 (testifying that it "[c]ould be" that between 30 and 50 boxes were destroyed)).

In September and October 2021, defense counsel spent eight days "reviewing the 700+ boxes of historic documents in the Herkimer storage room that remained." (Dkt. No. 247, ¶ 70). During this review, defense counsel located the invoice and associated records for the document destruction Mr. Kinsella referenced. (*Id.* ¶ 73).[11] The invoice and associated records indicate that Plaintiff utilized the services of ConfiData in March 2014 to shred 23,020 pounds of paper. (*See generally* Dkt. No. 247-12).[12] After further conferences and Plaintiff's inability or failure to identify the German representative referenced in Mr. Kinsella's testimony, Magistrate Judge Baxter ordered additional depositions relating to the maintenance of records in the Herkimer storage room and any culling of those records since 2008, including the culling of records in March 2014. (*See* Dkt. No. 247, ¶¶ 78–86). Defendants conducted a second Rule 30(b)(6) deposition of Mr. Kinsella, deposed fact witness Fred Schweizer, and conducted a Rule 30(b)(6) deposition of Alfred Bongers in January 2022. (Dkt. Nos. 248, 249, 250).

At his second deposition, Mr. Kinsella testified that he had never seen a company "document retention" or "document destruction policy." (Dkt. No. 248, at 7–8). Plaintiff's employees began transferring records that had been stored at the Site or in storage units to Herkimer in 2012 and completed the process over a couple of months. (*Id.* at 8). Mr. Kinsella testified that "any records regarding Universal Waste or Utica Alloys would be located in the

---

[11] Attorney Hennessey also states that defense counsel discovered "more than 15,000 pages of relevant information," including "historic operating records, shipping and transportation documents, business transaction documents . . . , [and] environmental and remedial action documents." (*Id.* ¶¶ 74–75 (emphasis omitted)). Defense counsel were not able to locate the boxes labeled "2008 Transaction." (*Id.* ¶ 77).

[12] According to ConfiData's website, a standard full "letter-size banker's box will range from 30–35 pounds" while a standard "legal-sized" box "will range from 45–50 pounds." "Secure Shredding Services Frequently Asked Questions," ConfiData, https://www.confidata.com/about/faqs/ (last visited Nov. 9, 2022). Thus, the 23,020 pounds destroyed are the equivalent of 460–767 banker's boxes.

Herkimer storage room" and that, to his knowledge, no documents from the Site or the two storage units were destroyed before they were moved to the Herkimer storage room. (*Id.* at 8, 10). Mr. Kinsella "organized" the Herkimer storage room by putting boxes on shelving by year. (*Id.* at 10). Plaintiff also "installed a fob system . . . so that it could be controlled as to who went in and out" of the storage room, but there were "no sign-in or sign-out sheets." (*Id.*). There are not "measures in place to record or track" any removal of documents from the storage room. (*Id.*). Mr. Kinsella again testified that a representative from Germany came to Herkimer and "instructed [him] to destroy certain boxes" that "would have come from the [Site] or the two storage units." (*Id.* at 15). Mr. Kinsella agreed, based on the March 2014 ConfiData invoice, that "hundreds of boxes" were destroyed. (*Id.* at 17). He testified that he did not know what was in the boxes that were shredded or why the boxes were destroyed, but noted that "[w]e were just looking to make room." (*Id.*).

Defendants next deposed Fred Schweizer, who was Vice President of Operations for Plaintiff at the relevant time. (Dkt. No. 249). Mr. Schweizer testified that when documents were transferred to the Herkimer storage room, the files of then-Chief Financial Officer Bob Carbone were kept "separate" from the "Inventory boxes." (*Id.* at 11). He also testified that the transfer of documents from the two storage units occurred after "Bob's boxes went to ConfiData." (*Id.*). Mr. Schweizer emailed Alfred Bongers, Plaintiff's head of internal audit, on November 7, 2013, asking whether he could shred Mr. Carbone's "old files going back to [the] 1970's." (*Id.* at 12, 61). Mr. Bongers reached out to Plaintiff's outside auditors to ask about the "legal requirement for storage of old historical files," and the auditors responded with a "list for record retention for businesses." (*Id.* at 62–63). The list, which Mr. Bongers passed on to Mr. Schweizer and Mr. Carbone, generally encompassed three categories: (1) business records which must be kept

forever, including "[l]egal records"; (2) business records which must be kept for six years, such as "[b]ank reconciliation and cancelled checks" and purchase and sales records; and (3) business records which must be kept for three years, such as monthly financial statements and credit card statements. (*Id.*). Mr. Schweizer then "went through each" of Mr. Carbone's boxes of files, which contained "checking, bank statements, and canceled checks and stuff like that." (*Id.* at 12). Mr. Schweizer testified that he was "aware of" the "environmental situation" and knew that "nothing should be thrown away that had anything to do with the environmental situation." (*Id.*). Mr. Schweizer did not keep an index of the boxes he reviewed and spent between five and 30 minutes reviewing each box. (*Id.* at 13, 16). He estimated that he "segregated for destruction" between 12 and 20 boxes. (*Id.* at 16; *see also id.* at 19–20 (testifying that he *kept* 12–20 boxes and that the pile segregated for destruction was "[b]igger")). He "never found anything that was environmentally in any of [the boxes]" and so "basically it was whether they were six years or younger." (*Id.* at 18).

Finally, Defendants deposed Mr. Bongers, head of internal audit of ELG Haniel GmbH. (Dkt. No. 250). Mr. Bongers generally did not have personal knowledge of document storage in the Herkimer storage room or any document destruction. All three deponents agreed that Plaintiff does not have a written policy on document retention or destruction. (Dkt. No. 248, at 11 (Kinsella); Dkt. No. 249, at 9 (Schweizer); Dkt. No. 250, at 39–40 (Bongers)). However, they testified that Plaintiff has an "informal" policy to never destroy documents. (*See* Dkt. No. 249, at 9 (Schweizer testifying: "Basically their policy was not to destroy anything but there was no official policy."); Dkt. No. 250, at 40 (Bongers testifying: "We have an unwritten policy which simply says don't throw anything away.")). Plaintiff has never instituted a litigation hold. (*See* Dkt. No. 248, at 11; Dkt. No. 249, at 15–16; Dkt. No. 250, at 81).

## III.    DEFENDANTS' REQUEST FOR SPOLIATION SANCTIONS

Defendants move for an order sanctioning Plaintiff for spoliation of evidence and request that Plaintiff's amended complaint be dismissed in its entirety or, in the alternative, an adverse inference that "the destroyed documents would have further supported" Defendants' defenses and a preclusion order preventing Plaintiff from offering evidence to "contradict the available remaining historical record" in support of those defenses. (Dkt. No. 246, at 2; *see* Dkt. No. 246-1, at 23–39). Defendants also seek an award of damages because Plaintiff's alleged spoliation has "caused them to incur significant and unnecessary costs and fees." (Dkt. No. 246-1, at 25). Plaintiff generally responds that it had no obligation to preserve the documents that were destroyed in March 2014 and that Defendants can only speculate that the documents are relevant. (*See* Dkt. No. 264-6, at 19–32).

### A.    Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A party seeking sanctions based on spoliation must establish, by a preponderance of the evidence: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)). A district court has authority to "impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002). The "choice of an

appropriate remedy for spoliation 'is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis.'" *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).

### B.     Discussion

#### 1.     Duty to Preserve the Evidence

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu*, 247 F.3d at 436. "Pursuant to this obligation, anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary." *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 144 (S.D.N.Y. 2007) (citation and internal quotation marks omitted). The scope of the duty to preserve "extend[s] to any documents . . . made by individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses.' . . . The duty also extends to information that is relevant to the claims or defenses of *any* party, or which is 'relevant to the subject matter involved in the action.'" *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217–18 (S.D.N.Y. 2003) ("*Zubulake IV*") (quoting Fed. R. Civ. P. 26).

Here, Defendants argue that Plaintiff's "obligation to preserve Site-related documents arose long before the destruction in March 2014," given that Plaintiff had "long been embroiled in an administrative enforcement dispute" with NYSDEC, had entered into multiple consent orders with NYSDEC including as recently as November 2012, had received the 2012 Notice Letter, and was awaiting a state-court decision on its challenge to NYSDEC's decision upholding the Universal Waste Site's Class 2 registration. (Dkt. No. 246-1, at 26–27). Plaintiff responds that (1) its duty to preserve evidence arose "at the earliest" "sometime after February 23, 2015,

when [Plaintiff] recognized that it would need to pursue litigation against Defendants for contribution" and (2) any duty to preserve evidence did not extend to the records that were destroyed in March 2014, which Plaintiff terms "Accounting Records." (Dkt. No. 264-6, at 20–21).

The Court concludes that Plaintiff had a duty to preserve evidence relevant to possible future litigation among the parties relating to the Site long before the document destruction in March 2014. The 2012 Notice Letter expressly informed Plaintiff that the NYSDEC had identified it as a "responsible party for the site's contamination" and that the Department was sending Notice Letters to other PRPs, including Defendants SMC and National Grid. (Dkt. No. 258-7, at 2–3). The 2012 Notice Letter requested that Plaintiff "develop, implement, and finance a Remedial Program for th[e] site." (*Id.*). In response, Plaintiff requested copies of the Notice Letters sent to other PRPs. (Dkt. No. 258-8, at 3). Moreover, the 2012 Consent Order, pursuant to which Plaintiff agreed to conduct a remedial investigation, expressly states that Plaintiff reserved "such rights as it may have," including under CERCLA, "to seek and obtain contribution, indemnification, and/or any other form of recovery . . . from other potentially responsible parties . . . for past or future response and/or cleanup costs." (Dkt. No. 258-10, at 9). These developments, especially when viewed in light of the lengthy history of known contamination, administrative involvement, and response actions at the Site, made litigation among the parties reasonably foreseeable prior to the document destruction at issue in March 2014.[13] *Cf. Arrowood Indem. Co. v. Bel Air Mart*, No. 11-cv-976, 2014 WL 841314, at *7, 2014 U.S. Dist. LEXIS 27627, at *19 (E.D. Cal. Mar. 4, 2014) (positing that knowledge of building

---

[13] The Court also notes that, when SMC filed for bankruptcy in 2002, the Companies and Clearview filed claims in the bankruptcy proceeding regarding expenses incurred in addressing contamination at the Site. (*See* Dkt. No. 251-5).

contamination "might have placed [the defendant] on notice of a potential CERCLA action," but not an insurance coverage action). Plaintiff's argument that its obligation to preserve evidence arose *after* it threatened other PRPs with litigation is unavailing. (*See* Dkt. No. 251-1, at 3 (February 23, 2015 letter seeking to "achieve an equitable approach to share" site costs "on an interim basis so as to avoid expensive and protracted litigation"), 4 ("ELGUA will pursue cost recovery against [Responsible Parties] that will not participate on a reasonable basis.")).

The Court further concludes that Plaintiff's obligation to preserve evidence encompassed the documents that were destroyed by ConfiData in March 2014. While Plaintiff correctly points out that an obligation to preserve does not require a corporation to "preserve every shred of paper," *Zubulake IV*, 220 F.R.D. at 217, the sheer volume of paper destroyed in March 2014 strongly suggests that Plaintiff destroyed more than simply "canceled checks, bank statements, checks and balances, equipment purchase orders, and other miscellaneous bookkeeping materials," (Dkt. No. 264-6, at 21–22). Plaintiff's argument relies on the testimony of Mr. Schweizer, who states that he went through Mr. Carbone's boxes of files and decided what to retain and what to destroy. However, Mr. Schweizer reviewed Mr. Carbone's boxes himself, without any legal guidance and relying solely on Plaintiff's outside accountant's list of documents to retain, which did not mention environmental matters. Mr. Schweizer also testified that he spent between only five and 30 minutes reviewing a box. It is therefore exceedingly likely that the destroyed documents were not merely the type of "Accounting Records" described by Plaintiff. More importantly, however, Mr. Schweizer's testimony does not account for the undisputed destruction of over 23,000 pounds of documents, the equivalent of 460–767 banker's boxes. (*See* Dkt. No. 249, at 19–20 (testifying that the pile of documents segregated for destruction was "[b]igger" than 12–20 boxes)). Nor does it explain Mr. Kinsella's consistent

testimony that a German representative ordered the destruction of certain documents, and that it was these documents that were destroyed in March 2014.[14] Thus, the Court finds that Plaintiff had an obligation to preserve the documents destroyed in March 2014.

### 2.      Culpability

A party may establish a culpable state of mind by "showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or negligently.'" *Residential Funding Corp.*, 306 F.3d at 108 (emphasis and citation omitted). "Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake IV*, 220 F.R.D. at 220 (footnote omitted).

Here, it is undisputed that Plaintiff knowingly destroyed the documents at issue in March 2014. Plaintiff also never instituted a litigation hold at any point to ensure the preservation of relevant evidence pertaining to its claims, including to date. *See Chin*, 685 F.3d at 162 (rejecting the argument that "failure to institute a 'litigation hold' constitutes gross negligence *per se*" but acknowledging that "the failure to adopt good preservation practices" is a relevant factor). Plaintiff has failed to implement reasonable measures to preserve and protect relevant documents: it maintains no logs or indexes of its documents or what documents are destroyed, and it has no system for tracking any documents which are removed from the Herkimer storage room. To the extent the March 2014 document destruction is in part the result of Mr. Schweizer's review of Mr. Carbone's files, Mr. Schweizer relied on a list from an outside accountant which did not adequately address documents which might be relevant to this litigation, and no index or log of which files were destroyed was created. Finally, it is undisputed that the March 2014

---

[14] Indeed, Plaintiff's opposition fails to address the testimony regarding the German representative's involvement at all.

document destruction occurred in violation of Plaintiff's unwritten or informal document retention policy to never destroy documents. *Cf. Dataflow, Inc. v. Peerless Ins. Co.*, No. 11-cv-1127, 2013 WL 6992130, at *7, 2013 U.S. Dist. LEXIS 183398, at *20 (N.D.N.Y. June 6, 2013) (noting that the defendant's "deletion of th[e] e-mails was in direct violation of the record retention policy in place at [the defendant company] at the time of Dataflow's claim"), *report-recommendation adopted in relevant part*, 2014 WL 148685, 2014 U.S. Dist. LEXIS 3882 (N.D.N.Y. Jan. 13, 2014). The Court finds that, under all of these circumstances, Plaintiff's failure to preserve evidence constituted, at a minimum, gross negligence. *Cf. id.*, 2013 WL 6992130, at *7, 2013 U.S. Dist. LEXIS 183398, at *19–20 (finding the defendant's failure to preserve evidence grossly negligent where the defendant did not implement a litigation hold, failed to take steps to preserve relevant evidence, and violated its record retention policy).

### 3. Relevance

Finally, a party seeking sanctions for spoliation must demonstrate that the destroyed evidence was "relevant" to its claims or defenses. At least where more severe sanctions are at issue, "'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Residential Funding Corp.*, 306 F.3d at 108–09. "Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" *Id.* at 109 (quoting *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998)); *see also Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) ("*Zubulake V*") ("In the context of a request for an adverse inference instruction, the concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant."). However, "[c]ourts must take care not to hold the prejudiced party to too strict a standard of

proof regarding the likely contents of the destroyed or unavailable evidence, because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from that destruction." *Residential Funding Corp.*, 306 F.3d at 109 (citation, internal quotation marks, brackets, and ellipses omitted). In some circumstances, a party's gross negligence will suffice "to support a finding that the evidence was unfavorable to the grossly negligent party." *Id.*

Here, while Plaintiff's gross negligence alone may support a presumption that the destroyed documents are relevant, the Court concludes that there is sufficient evidence from which a reasonable factfinder could conclude that the destroyed documents would be relevant and favorable to Defendants. First, it is undisputed that the destroyed documents relate to the Site and are from the time period at issue. Second, as discussed in greater detail above, there are concerns about the adequacy of Mr. Schweizer's review of Mr. Carbone's files, Plaintiff's failure to explain the undisputed destruction of 23,020 pounds of documents, and the lack of any record of what was destroyed. Moreover, Defendants assert that even Mr. Carbone's "accounting" or "bookkeeping" files were relevant to their defenses, as those files included "old financial records" concerning "operations" at the Site. (Dkt. No. 246-1, at 33). The Court agrees that canceled checks, purchase orders, and payment records are relevant to Defendants' statute of limitations and statutory scrap recycling defenses. Defendants have also identified other types of business records that Plaintiff likely would have maintained "reflecting the day-to-day operations" at the Site which are relevant to their defenses. (*Id.* at 34–36). These records would contain information relating to, among other things, the source, quantity, and value of scrap metal received by Plaintiff, payments made by Plaintiff for that metal, Plaintiff's protocol for

"inspecting, handling, and cleaning scrap materials," and regulatory compliance. (*Id.*).[15] Finally, although Plaintiff argues that relevant inventory documents "were never removed from Herkimer," (Dkt. No. 264-6, at 28–29), Defendants have represented that there is a "conspicuous gap in the documentary records regarding Universal Waste's operation of the Site," but no corresponding gap in the Utica Alloys records. (Dkt. No. 246-1, at 36; *see also, e.g.*, Dkt. No. 247, ¶ 76; Dkt. No. 252, ¶¶ 5, 10).

Plaintiff nonetheless argues that "many of the purportedly missing documents would be in Defendants' possession" and that Defendants therefore suffered no prejudice by the document destruction. (Dkt. No. 264-6, at 29). However, the Court agrees with Defendants that they "are in a fundamentally different posture" and were not on "notice for decades of the need to preserve documents concerning the Site." (Dkt. No. 265, at 18). Furthermore, Defendants would not necessarily have records concerning other PRPs, Plaintiff's recycling operations, or remedial activities. (*See id.*).

Accordingly, the Court concludes that Defendants have satisfied their burden of showing that the destroyed documents are relevant.

### 4.    Choice of Sanction

Defendants argue that Plaintiff's spoliation warrants dismissal of all of its claims. (Dkt. No. 246-1, at 37). In the alternative, Defendants request an adverse inference that "the destroyed documents would have further supported their statute of limitations and statutory scrap recycling defenses" and a "preclusion order that prevents Plaintiff from offering any evidence to contradict

---

[15] In the event of a finding of liability, such evidence would also be relevant to the Court's apportionment of responsibility among liable parties. *See* 42 U.S.C. § 9613(f)(1).

the available remaining historical record in support of those defenses." (Dkt. No. 246, at 2).

Finally, Defendants request an award of "damages, including attorneys' fees and costs." (*Id.*).

Sanctions for spoliation of evidence should aim to accomplish three goals: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *West*, 167 F.3d at 779 (quoting *Kronisch*, 150 F.3d at 126). "It is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy. The choices include—from least harsh to most harsh—further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal (terminating sanctions)." *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014) (citation omitted).

"[T]he Second Circuit has endorsed four factors for a district court to consider in exercising its discretion to impose sanctions pursuant to Rule 37: '(1) the willfulness of the noncompliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance.'" *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 120 (S.D.N.Y. 2018) (quoting *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)). A district court is free to consider "the full record in the case in order to select the appropriate sanction." *S. New England Tel. Co.*, 624 F.3d at 144 (citation omitted).

At this point, in light of the Court's ruling below granting Defendants' motion for summary judgment as to Plaintiff's CERCLA claims, the Court will request a status report

and/or letter briefing from the parties regarding how they seek to proceed regarding the issue of sanctions. *See infra* Section V.

## IV.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As relevant to Defendants' summary judgment motion, the amended complaint asserts (1) a CERCLA Section 107 claim, (2) a CERCLA Section 113(f)(1) claim, and (3) a claim for a declaratory judgment allocating future Site-related costs and damages pursuant to CERCLA Section 113(g)(2). Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that Plaintiff's Section 107 claim is barred by the statute of limitations, Plaintiff cannot state a viable Section 113(f)(1) claim, and Plaintiff's declaratory judgment claim must be dismissed in the absence of a viable CERCLA claim. (Dkt. No. 246-1, at 39–55).

### A.   Standard of Review

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where

the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B.    CERCLA Section 107 Claim

Count I of the amended complaint seeks cost recovery under Section 107 of CERCLA, which allows a party to "seek reimbursement for all removal or remedial costs associated with the hazardous materials on the property." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120–21 (2d Cir. 2010) (internal footnote omitted); *see* 42 U.S.C. § 9607(a) (providing that, among others, "the owner and operator of a vessel or a facility" and "any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous

substances owned or possessed by such person, by any other party or entity, at any facility" "shall be liable for" "any other necessary costs of response incurred by any other person consistent with the national contingency plan"). Defendants move for summary judgment on Plaintiff's Section 107 claim, arguing that the claim is time-barred as to all Defendants because Plaintiff initiated physical on-site construction of the remedial action at the Site before June 1, 2009—more than six years before Plaintiff entered into any tolling agreement or initiated this action. (Dkt. No. 246-1, at 39–50). Plaintiff responds that its Section 107 claim is timely and accrued in 2015 because (1) its prior response actions were removal actions, not remedial, and (2) even if its prior actions were remedial, the single-remediation principle does not apply in this case. (Dkt. No. 264-6, at 32–46).

"For cost recovery actions under § 107, CERCLA 'distinguishes between two kinds of response: remedial actions—generally long-term or permanent containment or disposal programs—and removal efforts—typically short-term cleanup arrangements.'" *Schaefer v. Town of Victor*, 457 F.3d 188, 195 (2d Cir. 2006) (quoting *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2d Cir. 1985)). "The statute of limitations for the recovery of costs related to 'removal actions' is three years after the completion of the removal action . . . while the limitations period for the recovery of costs related to 'remedial actions' is six years after the initiation of physical on-site construction of the remediation." *Id.*; *see* 42 U.S.C. § 9613(g)(2). Thus, to determine which statute of limitations applies, the Court must determine whether the response actions at issue were removal or remedial. This is a question of law. *NYSEG*, 766 F.3d at 230.

### 1.    Nature of Response Actions

CERCLA defines "removal" action as:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). It defines "remedial action" as:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

*Id.* § 9601(24). The term "remedial action" includes "offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials." *Id.*

    While the "statutory definitions do not provide clear insight as to the boundary between removals and remediations," "courts have agreed on a general principle to distinguish the two: removal actions are generally clean-up measures taken in response to immediate threats to public health and safety that address contamination at its endpoint, while remedial actions are typically actions designed to permanently remediate hazardous waste that address contamination at its source." *MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 219 (2d Cir. 2020) (quoting *NYSEG*, 766 F.3d at 230–31) (internal quotation marks and brackets omitted). The "key distinction" between removal and remedial actions is "immediacy and comprehensiveness." *Id.* (citation omitted). Generally, removal actions are undertaken to deal with threats requiring an "immediate response" and target the "deleterious *effects* of contamination," rather than "eliminat[ing] or permanently contain[ing] the *source* of contamination." *Id.* Removal actions

"are often planned and executed relatively quickly in order to immediately abate public health hazards." *Id.* at 220; *see also New York v. Next Millenium Realty, LLC*, 732 F.3d 117, 126 (2d Cir. 2013) (noting that a "defining characteristic of removal actions" is that they are taken "in response to an imminent public health hazard"). Remedial actions, by contrast, are undertaken "to permanently remediate contamination, generally after months (if not years) of correspondence with regulators," testing, analysis, and feasibility studies. *MPM*, 966 F.3d at 220 (citing 40 C.F.R. § 300.430(a)(2)). Remedial actions "typically address 'the underlying source of the contamination.'" *Id.* (quoting *NYSEG*, 766 F.3d at 236).

Here, Defendants argue that the Companies "initiated construction of at least three significant 'remedial' actions in 1979, 2002, and 2007," any one of which renders Plaintiff's Section 107 claim untimely. (Dkt. No. 246-1, at 44). Plaintiff responds that it did not initiate any remedial action at the Universal Waste Site until 2015 and that the response actions Defendants identify were removal actions designed as "interim or temporary solution[s] to specific contamination issues at the Site." (Dkt. No. 264-6, at 34).

### a.      Identification of the Facility

As an initial matter, Defendants argue that the CERCLA "facility" at issue in this case should be defined as the full, 23-acre Site, not simply the Universal Waste Site. (Dkt. No. 246-1, at 40–42). Plaintiff responds that the Universal Waste Site and Utica Alloys Site have "already been divided" by NYSDEC and should be considered separate facilities under CERCLA. (Dkt. No. 264-6, at 39–40).

"CERCLA defines the term 'facility' broadly to include any property at which hazardous substances have come to be located." *Shore Realty Corp.*, 759 F.2d at 1043 n.15 (citing 42 U.S.C. § 9601(9)). The term "facility" in CERCLA:

means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

"[A] contaminated site that is or was managed as a whole constitutes a single facility for CERCLA purposes . . . [and] a widely contaminated area should not unnaturally be divided into multiple facilities in order to limit a party's liability." *Alprof Realty LLC v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, No. 09-cv-5190, 2012 WL 4049800, at *8, 2012 U.S Dist. LEXIS 131046, at *22–23 (E.D.N.Y. Sept. 13, 2012) (collecting cases); *see PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 178–79 (4th Cir. 2013) ("Courts have uniformly refused to divide widely contaminated properties . . . into separate facilities in response to a party's claim to be responsible for contamination in only certain parts of the property.") (citation omitted). But "where parcels are naturally divisible into parts or functional units, they should not be considered as a single facility." *Niagara Mohawk Power Corp. v. Consol. Rail Corp.*, 291 F. Supp. 2d 105, 125 (N.D.N.Y. 2003) (citing *United States v. 150 Acres of Land*, 204 F.3d 698, 709 (6th Cir. 2000)), *rev'd in part on other grounds*, 596 F.3d 112 (2d Cir. 2010).

Courts have often recognized the boundaries of a facility as being defined partly by the areas that were contaminated by a common source. *See Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 616 F. Supp. 2d 228, 270–71 (D. Conn. 2009) ("[A] site with a single source of pollution is almost always considered one 'facility' within the meaning of CERCLA and is generally not divisible absent extraordinary circumstances." (citations omitted)); *Durham Mfg. Co. v. Merriam*

*Mfg. Co.*, 294 F. Supp. 2d 251, 267 (D. Conn. 2003) (holding that Superfund site could not be divided for liability purposes where plaintiff could not establish that there were "separate and distinct plumes of ground-water contamination" within the site); *New York v. Westwood-Squibb Pharm. Co., Inc.*, 138 F. Supp. 2d 372, 379 (W.D.N.Y. 2000) (holding that two properties, which had been aggregated into one National Priorities List site by EPA, were part of the same facility when they had a common source of contamination); *see also 150 Acres of Land*, 204 F.3d at 709 ("The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination. However, an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single 'facility,' even if it contains parts that are non-contaminated." (quoting *United States v. Township of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998) (ellipses omitted))).

Courts also look to whether the areas in question were jointly managed or operated. *See 150 Acres of Land*, 204 F.3d at 709 (holding that division of property into three parcels did not constitute a "reasonable or natural" division, and that all parcels were part of the same CERCLA facility); *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 419 (4th Cir. 1999) (holding that entire property was a single facility where it "was at all relevant times operated by a single party, and both the EPA and Axel itself treated the entire property as a single facility for CERCLA remediation purposes in the consent decree that they signed"); *Township of Brighton*, 153 F.3d at 313 (considering the fact that "the entire property was operated together as a dump" when determining that it constituted a single facility); *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 843 (4th Cir. 1992) (holding that site was divisible into separate facilities where it "was subdivided and separate portions of it were leased out to individual tenants").

Here, the Court concludes that the full Site is a single facility for CERCLA purposes. The Universal Waste and Utica Alloys Sites have shared common ownership, control, and management since at least 1984. (*See* Dkt. No. 252-10 (1984 indenture transferring the property to Clearview and 1984 leases of the property to the Companies)); *see supra* Section II.A.7 (detailing 2008 sale of property to Plaintiff). It is undisputed that the Companies "had the same voting stockholder, officers, and directors, used the same buildings and areas at the Site, and shared Site costs." (Dkt. No. 246-2, ¶ 3; Dkt. No. 264, ¶ 3). This common ownership and management weigh in favor of finding a single facility. *Cf. Cooper Crouse-Hinds, LLC v. City of Syracuse*, 568 F. Supp. 3d 205, 234 (N.D.N.Y. 2021) (noting that "[c]ourts routinely look to whether the areas in question were jointly managed or operated"). Moreover, the PCB and TCE contamination at issue extends throughout the 23-acre Site and results from the same sources. *Cf. Yankee Gas Servs. Co.*, 616 F. Supp. 2d at 270–71; *Durham Mfg. Co.*, 294 F. Supp. 2d at 267. Finally, NYSDEC investigated the Site as a single site for approximately twenty years and listed it on the registry as such. *Cf. Cooper Crouse-Hinds*, 568 F. Supp. 3d at 234–35 (finding that two landfills constituted a single facility where they were "operated and managed for a singular purpose" for over 75 years and New York State had "addressed the North and South Landfills unitarily" as a single site).

Although Plaintiff argues that the Site is "reasonably [and] naturally divided" into the Utica Alloys and Universal Waste Sites, (Dkt. No. 264-6, at 39–40), the administrative bifurcation of the Site is not determinative. *Cf. New York v. Gen. Elec. Co.*, No. 14-cv-747, 2017 WL 1239638, at *21, 2017 U.S. Dist. LEXIS 50026, at *58–59 (N.D.N.Y. Mar. 31, 2017) ("The fact that the State, in 1990 began to list the two properties as one Site in the Registry does not require a different finding, as the State's designation of the two properties as one 'facility' does

not make it so."); *cf. Am. Premier Underwriters Inc. v. Gen. Elec. Co.*, 866 F. Supp. 2d 883, 895

(S.D. Ohio 2012) (noting that operable unit "divisions of a site may or may not correspond to the

geographic bounds of the 'facility,' as that term is defined in CERCLA"); *cf. PCS Nitrogen Inc.*,

714 F.3d at 178 (noting that the definition of facility "is not predicated . . . on the area targeted

for remediation"). It is notable the state administrative bifurcation of the Site happened in 1998,

more than 20 years after contamination was first discovered, and only at Plaintiff's request. (*See*

Dkt. No. 255-1, at 3 (letter dated April 20, 1994 requesting bifurcation of "the investigation of

the Site")). NYSDEC had no objection to a "phased approach" to investigating the Site "utilizing

two consent orders" as long as the Department "ha[d] some assurance that the second phase

(investigation of the Universal Waste portion of the site) will actually take place in a timely

manner." (Dkt. No. 255-3, at 2; *see also* Dkt. No. 255-4, at 2 (internal NYSDEC memorandum

noting that "while a full site [assessment] is preferred," Department staff had "agreed" that a

proposed assessment "for the Utica Alloys parcel does advance the Department's knowledge of

the site conditions")). When NYSDEC bifurcated the Site, it noted that it was doing so "to

facilitate an independent remediation" of the Utica Alloys portion. (Dkt. No. 255-13, at 4). The

Court concludes that the 1998 administrative bifurcation was more akin to the division of the

Site into operable units and a division as convenience. *Cf. Durham Mfg. Co.*, 294 F. Supp. 2d at

267 (finding a single facility and noting that the "historical [administrative] division of the Site"

was "a division of convenience and . . . not supported by scientific evidence").

Thus, the Court finds as a matter of law that the 23-acre Site constitutes one CERCLA

facility.

b.    **2007 Response Action**

As stated above, Utica Alloys excavated 715 tons of PCB- and TCE-contaminated soil

and pumped 6,951 gallons of contaminated groundwater for transfer and off-site disposal in

December 2007. The Court concludes that this 2007 response action is remedial in nature.[16]

The Court finds that this 2007 response action is more akin to a remedial action than a

removal action.[17] First, in line with the statutory definition of a remedial action, the 2007 work

was "consistent with [a] permanent remedy." 42 U.S.C. § 9601(24). Plaintiff argues that this

work cannot be a remedial action because it was "completed as part of an *interim* remedial

measure required by DEC, rather than any sort of final and permanent cleanup." (Dkt. No. 264-6,

at 40; *see id.* at 34 (arguing that "remedial work did not begin until 2015 at the earliest when

[Plaintiff] began working with DEC on a permanent and final, once-and-for-all cleanup of the

Site")). However, IRMs can constitute remedial actions, *NYSEG*, 766 F.3d at 234–35 (noting that

"IRMs can either be removal or remedial actions" and finding CERCLA claim time-barred

where the cleanup at issue "was part of a larger remedial action"), and the fact that a "final"

remedial plan had not been determined at that time is not dispositive, *see Schaefer*, 457 F.3d at

207–09 (rejecting the argument that a remedial action can be initiated only after approval of a

final remedial action plan, noting that the "plain language of the statute . . . speaks of 'actions

*consistent with* permanent remedy' and nowhere mentions . . . approval of the final remedial

---

[16] Because the Court concludes that the 2007 response action was remedial and that application of the single-remediation principle is appropriate in this case, *infra* Section IV.B.2, the Court does not address the 1979 or 2002 actions. Further, in light of the Court's conclusion that the Site is one facility under CERCLA, *supra* Section IV.B.1.a, the parties' dispute regarding whether the 2007 work was completed solely on the Utica Alloys Site, (*see* Dkt. No. 246-1, at 11–12; Dkt. No. 264-6, at 39–40), is not relevant.

[17] The Court notes that soil excavation and disposal fit within the statutory definitions of both removal actions and remedial actions. 42 U.S.C. § 9601(23) (defining "removal" to include "the disposal of removed material"), 9601(24) (defining "remedial action" to include "offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials"); *cf. Cooper Crouse-Hinds*, 568 F. Supp. 3d at 227–28 (relying on the plain language of the statutory definitions of removal and remedial actions where, unlike here, there was no overlap or "statutory confusion" with regard to the corrective action at issue).

action plan"); *see also Yankee Gas Servs.*, 616 F. Supp. 2d at 276 (noting that the Second Circuit

has rejected the argument that a final remedial action plan is required before the statute of

limitations begins to run on a remedial action (citing *Schaefer*, 457 F.3d at 207)); *accord Cytec*

*Indus., Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 838 (S.D. Ohio 2002) (rejecting

argument that a remedial action cannot begin until a "lead agency" issues "final, written approval

of the remedial design for the site at issue"). Here, the excavation, removal, and off-site disposal

of 715 tons of PCB-contaminated soil are clearly consistent with a permanent remedy for the

PCB contamination at the Site. *Cf. Yankee Gas Servs.*, 616 F. Supp. 2d at 274 (rejecting the idea

that "the removal of 9,000 tons of contaminated soil" would be "inconsistent with the permanent

remedy" and noting that the plaintiffs surely "d[id] not intend to return the contaminated soil to

the site").

  Second, the 2007 soil excavation and disposal were aimed at eliminating the source of the

PCB contamination and not at mitigating the deleterious effects of the contamination at its

endpoint. *MPM*, 966 F.3d at 219 (noting that removal actions generally target "reducing the

deleterious *effects* of contamination" but do not "seek to eliminate or permanently contain the

*source* of contamination"); *see id.* at 222–23 (finding that the construction of an earthen cap,

diversion ditch, and interceptor trench were not efforts to "neutraliz[e] contamination 'at its

endpoint'" but were rather "steps to permanently prevent contaminants . . . from migrating away

from their source—*i.e.*, the location of their burial"). The PCB areas that were excavated were

known and did not present an imminent migration threat that needed to be contained; rather, the

2007 response action addressed the PCB contamination at its source. *Cf. Cooper Crouse-Hinds*,

568 F. Supp. 3d at 229 (holding that the construction of check dams "was an immediate action

taken to prevent the migration of contamination further downstream" and therefore a removal

action); *see also Next Millenium Realty*, 732 F.3d at 127 (holding that the construction of a

carbon adsorption system and air stripper tower were removal actions where they "were designed

as measures to address water contamination at the endpoint—the wells—and not to permanently

remediate the problem").

Finally, and significantly, Plaintiff has offered no evidence that the 2007 soil excavation

and disposal were conducted to address an imminent threat or emergency situation. *See NYSEG*,

766 F.3d at 234 ("[T]he cleanup was not designed to address an imminent health concern.");

*MPM*, 966 F.3d at 219 (noting that the "key distinction" between removal and remedial actions

is "immediacy and comprehensiveness" and that removal actions are done to deal with threats

requiring an "immediate response"). Rather, the 2007 work addressed the same PCB

contamination that was first discovered in 1977 and occurred only after years of planning,

investigation, and coordination with NYSDEC. (*See, e.g.*, Dkt. No. 253-7 (1982 NYSDEC letter

indicating that it was investigating the Site); Dkt. No. 253-8 (1982 Agreement); Dkt. No. 253-9

(Clayton Study); Dkt. No. 254 (1986 Notion of Motion for Summary Order); Dkt. No. 254-9, at

2–3 (1991 NYSDEC memorandum noting delay and stating that the Site was not an "imminent

threat")). The 2007 IRM work was conducted pursuant to the 1999 Consent Order, after a

Remedial Investigation and Interim Remedial Measures Alternative Analysis Program was

initiated in 1999, and there is record evidence regarding the planning for the 2007 work from

2003. (Dkt. No. 258, at 6; Dkt. No. 256-7). Thus, there is no genuine dispute that the 2007 soil

excavation and disposal was not addressed to any imminent public threat but rather occurred

after "months (if not years) of correspondence with regulators," investigation, and planning.

*MPM*, 966 F.3d at 220.[18]

---

[18] Indeed, Plaintiff repeatedly sought to delay or avoid investigating or remediating the Site, often arguing to NYSDEC that no action should be required. (*E.g.*, Dkt. No. 253-6, at 2 (arguing that the Site presented "no hazardous waste

Accordingly, the Court concludes that the 2007 excavation and disposal of PCB- and TCE-contaminated soil occurred on the Site and was remedial in nature.[19] Plaintiff's argument that the work performed at the Universal Waste Site beginning in 2015 was "markedly different" and more "comprehensive," (Dkt. No. 264-6, at 41–42), does not preclude characterization of the 2007 IRM as remedial but rather is more germane to application of the single-remediation principle, which the Court turns to next.

## 2.    Application of the Single-Remediation Principle

Defendants argue that Plaintiff's Section 107 claim is time-barred because, as discussed above, Plaintiff initiated the physical on-site construction of the remedial action more than six years before Plaintiff entered into a tolling agreement with any Defendant or initiated this action and because the costs Plaintiff seeks to recover in this suit relate to that same remedial action under the single-remediation principle. (Dkt. No. 246-1, at 47–49). Plaintiff responds that the Second Circuit recently "clarified that the single remediation principle is unworkable" and that the work undertaken at the Site in 2015 addressed an "expanded range of contaminants." (Dkt. No. 264-6, at 44–45).

In *NYSEG*, the Second Circuit endorsed what was an apparently categorical holding that "there can only be one remedial action at a site." *NYSEG*, 766 F.3d at 236. In *MPM*, however, the court clarified that while the single-remedial principle "is a reliable prescription in the great

---

problem"); Dkt. No. 254-3 (requesting that NYSDEC delist or reclassify the Site in 1986); Dkt. No. 256-5, at 7 (2003 petition to delist or reclassify the Universal Waste Site on the Registry)). And NYSDEC's decision to administratively bifurcate the Site in 1998 was motivated, at least in part, by the agency's desire for Plaintiff to investigate and remediate at least a portion of the 23-acre Site. (*See* Dkt. No. 255-13, at 4).

[19] The Court further notes that Plaintiff characterized the 2007 work as "remedial" to challenge NYSDEC's regulatory fee assessment. (Dkt. No. 258-2, at 2–3 (claiming a fee exemption because the hazardous waste generated by the 2007 excavation and disposal was "generated in the *remediation* of an inactive hazardous waste disposal site" subject to regulatory approval) (emphasis added)). While "generic uses of the word 'remedial'" do not alone "render an action 'remedial' for purposes of the statute of limitations," *Next Millenium Realty*, 732 F.3d at 130–31 (citations omitted), Plaintiff's affirmative representation to NYSDEC that the 2007 work was remedial "does serve to confirm the Court's view that what occurred at the [Site] was a remediation," *Yankee Gas Servs.*, 616 F. Supp. 2d at 272–73.

majority of cases," the principle does not control "if the circumstances of a case would render it *illogical* and *unfair*, and would *defeat* the statutory designs or objectives of [the Resource Conservation and Recovery Act ("RCRA")] and CERCLA." 966 F.3d at 226–27; *see also id.* at 227–28 (discussing the statutory purposes of RCRA and CERCLA, describing "cost-recovery as an essential motivator in the RCRA/CERCLA framework" because it incentivizes private parties and regulators "to ensure that cleanups are conscientious and thorough," and observing that "CERCLA's manifest purpose [is] to 'encourag[e] the timely cleanup of hazardous waste sites' by private parties by 'placing the cost of that cleanup on those responsible for creating or maintaining the hazardous condition.'" (quoting *Consolidated Edison Co. of New York, Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005))). For example, application of the single-remediation principle would be "inappropriate" when "the subsequent remediation undertakes to remediate a problem that did not exist at the time of the prior remedial act," where a "site operator discovers a previously unsuspected contamination that was unrelated to, and perhaps far distant from, a previously remediated contamination," or where a party would be "unfairly precluded" from bringing suit. *Id.* at 227. But when "the contamination to be addressed arises from a single source, and the operator undertakes to remedy that 'underlying source of contamination,' the distinct steps taken in furtherance of that objective will constitute a single remediation." *Id.* at 229 (brackets and internal citation omitted). The Second Circuit stated that a "helpful inquiry" would be to "examine whether the recent action (sought by the remediator to be characterized as a new remediation) falls within the remedial scope of the previous remediation as revealed in the record before the regulatory agency." *Id.* at 230.

In sum, the single-remediation principle "means simply and logically that the plaintiff cannot escape the six-year limitation period and endlessly postpone the bringing of suit by

characterizing subsequent phases of the initial project as new remediations." *Id.* at 225. But where a subsequent remediation "seeks to address a different set of problems—*e.g.* problems that were non-existent, unknown, elsewhere, or undisclosed to the regulators and unrevealed in an earlier remediation plan—[the subsequent remediation] should not be considered part of the [first] remediation" and would be entitled to a new six-year statute of limitations. *Id.* at 230.

   The Court concludes that application of the single-remediation principle here would not be illogical or unfair because Plaintiff has not pointed to evidence from which a reasonable factfinder could conclude that the contamination being addressed pursuant to the 2015 Consent Order is a new problem that was non-existent, unknown, and/or not reasonably foreseen at the time of the 2007 soil excavation and disposal. It is undisputed that remedial work beginning in 2015 pursuant to the 2012 Consent Order addressed PCB contamination at the Site, (*see* Dkt. No. 258-16, at 8 (2019 report noting that PCBs "have been identified and are a constituent of potential concern (COPC) for Site soil")), and Plaintiff makes no argument that this PCB contamination is not the same PCB contamination that was first discovered in 1977 and which has long been known to NYSDEC. Similarly, while Plaintiff argues that the 2015 remedial work addresses contaminants other than PCBs, such as volatile organic compounds, (Dkt. No. 264-6, at 45), Plaintiff again makes no argument that this is a new, different, or unforeseen problem. Application of the single-remediation principle is therefore logical. *See MPM*, 966 F.3d at 224–25 (finding application of the single-remediation principle appropriate where subsequent remedial steps "were either explicitly foreseen at the start of the remediation" or "at least contemplated"); *id.* at 225 (noting that the plaintiffs in the precedents *NYSEG* relied on in enunciating the single-remediation principle had "at least a general awareness of the contamination problems" at the outset and that the "subsequent stages of response" were either

"further steps towards remediating the original problems" or "steps to remediate different aspects of the originally known problem" (citations omitted)).

Moreover, application of the single-remediation principle in these circumstances is not unfair because nothing precluded Plaintiff from bringing a Section 107 cost recovery action against Defendants prior to the expiration of the limitations period. Evidence in the record indicates that Plaintiff was aware well before it initiated the 2007 soil excavation and disposal that certain Defendants might be responsible for a share of response costs incurred in relation to the Site and that litigation might be necessary to recover those costs. (*E.g.*, Dkt. No. 254-5, at 3–4 (1989 NYSDEC decision noting that the Companies had moved to join "several additional parties," including Defendants SMC and GE, to NYSDEC's enforcement action regarding the Site); Dkt. No. 254-10, at 5, 7 (1992 attorney memorandum recounting that Utica Alloys did not "want to be suing a lot of entities" and that the Companies' President, Mr. Jiampietro, did "not want, at this time, to sue General Electric, which is his best customer, or Special Metals, another important customer")). Plaintiff has been addressing the same contamination at the Site for decades and cannot escape the statute of limitations by characterizing the work initiated in 2015 as a new remedial action. *MPM*, 966 F.3d at 225 (noting that a plaintiff cannot escape the statute of limitations by "characterizing subsequent phases of the initial project as new remediations" and that a plaintiff "whose suit is time-barred in such circumstances has suffered no unfairness as the preclusion was simply the result of the plaintiff's needless delay").

Accordingly, because the Court concludes that the 2007 soil excavation and disposal constituted a remedial action and that application of the single-remediation principle is appropriate, Plaintiff's Section 107 claim is untimely as to each Defendant. Defendants' motion for summary judgment on Plaintiff's Section 107 claim is therefore granted.

### C.      CERCLA Section 113 Claim

Defendants move for summary judgment on Plaintiff's CERCLA Section 113 claim,

arguing that (1) Plaintiff cannot state a viable claim under Section 113(f)(1), and (2) the amended

complaint does not allege a claim for contribution under Section 113(f)(3)(B) and Plaintiff

cannot state any viable or timely claim under that subsection in any event. (Dkt. No. 246-1, at

51–55). Plaintiff responds that it has a viable claim under Section 113(f)(1) and, while

acknowledging that it has not plead a claim under Section 113(f)(3)(B), asserts that it could plead

such a timely claim. (Dkt. No. 264-6, at 46–51).

Under Section 113(f)(1) of CERCLA, "[a]ny person may seek contribution from any

other person who is liable or potentially liable under section 9607(a) of this title, during or

following any civil action under section 9606 of this title or under section 9607(a) of this title."

42 U.S.C. § 9613(f)(1). Defendants argue they are entitled to summary judgment on Plaintiff's

Section 113(f)(1) contribution claim because Plaintiff has not been sued under CERCLA Section

106 or 107, a prerequisite to such a claim. (Dkt. No. 246-1, at 51). Plaintiff responds that Section

113(f)(1) should be construed broadly and that it can state a viable Section 113(f)(1) claim

because it is "subject to CERCLA liability under the 2015 [Consent Order]." (Dkt. No. 264-6, at

47–48).

As the Supreme Court has held, the "clear meaning of the text" in Section 113(f)(1)

"authorizes contribution claims only 'during or following' a civil action under § 106 or

§ 107(a)." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166–68 (2004); *see id.* at 166

("The natural meaning of this sentence is that contribution may only be sought subject to the

specified conditions, namely, 'during or following' a specified civil action."); *Guam v. United*

*States*, 141 S. Ct. 1608, 1613 (2021) ("The § 113(f)(1) anchor provision is especially clear on

this point, allowing contribution "during or following any civil action under §[1]06 of this title or

under §[1]07 of this title."). It is undisputed here that Plaintiff has not been *sued* under Section 106 or 107. *See Niagara Mohawk*, 596 F.3d at 122 (noting, after *Cooper Industries*, that Niagara Mohawk "correctly conceded that it could not proceed with a contribution claim under § 113(f)(1)—it had not been sued under § 106 or § 107(a)").

While not entirely clear, Plaintiff appears to argue that it can nonetheless bring a Section 113(f)(1) contribution claim because it has been subject to "pre-litigation regulatory action" imposing CERCLA liability and which counts as a "civil action" under Section 106 or 107(a). (Dkt. No. 264-6, at 47–48 (referring to the 2015 Consent Order)).[20] Plaintiff cites to two out-of-Circuit cases which held that a Section 106 administrative order qualifies as a "civil action under" Section 106 or 107(a) for purposes of Section 113(f)(1). (*Id.* (first citing *PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 104 F. Supp. 3d 729, 742–43 (D.S.C. 2015) (holding that a Section 106 order issued by the EPA qualifies as a civil action under Section 106, but noting that "[s]everal district courts" have concluded to the contrary); and then citing *Carrier Corp. v. Piper*, 460 F. Supp. 2d 827, 840–41 (W.D. Tenn. 2006) (finding that a unilateral administrative order issued by the EPA constituted a "civil action" under Section 113(f)(1)))).[21] It is undisputed here, however, that the EPA never issued a Section 106 administrative order against Plaintiff, rendering *PCS Nitrogen* and *Carrier Corp.* inapposite. To the contrary, courts in the Second Circuit have consistently rejected Section 113(f)(1) claims where the plaintiff fails to show the existence of a Section 106 abatement order or that it has been sued under Section 106 or 107(a). *See W.R.*

---

[20] To the extent Plaintiff relies on the savings clause in Section 113(f)(1), *see* 42 U.S.C. § 9613(f)(1) ("Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title."), its reliance is misplaced. "The sole function of [this] sentence is to clarify that § 113(f)(1) does nothing to 'diminish' any cause(s) of action for contribution that may exist *independently* of § 113(f)(1)." *Cooper Indus.*, 543 U.S. at 166–67 (emphasis added). The savings clause is therefore immaterial to the viability of Plaintiff's Section 113(f)(1) claim itself.

[21] The *Cooper Industries* Court did not decide whether "an administrative order under § 106" "would qualify as a 'civil action'" under Section 106 or 107(a). 543 U.S. at 168 n.5.

*Grace & Co.–Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 89–90 (2d Cir. 2009) (noting that "a party may pursue a contribution claim under section 113(f)(1) only if that party has been subject to a civil action as specified in that section" but that a PRP "who has remediated a contaminated site pursuant to an administrative consent order has a cause of action to pursue necessary associated costs under section 107"); *AMW Materials Testing, Inc. v. Town of Babylon*, 187 F. App'x 24, 26 (2d Cir. 2006) (summary order) (noting that plaintiffs "failed to satisfy the statutory requirements for bringing a claim of contribution under Section 113(f)(1) where they "failed to show that [a Section 106 abatement order] was issued"); *Town of Oyster Bay v. Northrop Grumman Corp.*, No. 05-cv-1945, 2006 WL 8439567, at *6, 2006 U.S. Dist. LEXIS 114560, at *16 (E.D.N.Y. May 2, 2006) (holding that a town administrative consent order did not constitute a "civil action" under Section 106 or 107 and noting that an administrative order under Section 106 "is something 'in addition to' and separate from any 'other action taken by a State or local government'" (citation omitted)).

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's Section 113(f)(1) contribution claim. In light of Plaintiff's acknowledgment that "it has not plead a claim pursuant to CERCLA § 113(f)(3)(B)," (Dkt. No. 264-6, at 48–49), and the fact that Plaintiff has not sought leave to amend its amended complaint to add such a claim, the Court does not reach the parties' arguments regarding whether Plaintiff could state a viable and timely claim under Section 113(f)(3)(B).

### D.    Declaratory Judgment Claim

Count IV of the amended complaint seeks a declaratory judgment pursuant to CERCLA Section 113(g)(2) and the Declaratory Judgment Act, 28 U.S.C. § 2201, which "allocat[es] future Site Related Costs and damages among [Plaintiff] and Defendants, and hold[s] Defendants liable for their share of future Site Related Costs as allocated to it." (Dkt. No. 43, ¶¶ 68–71).

Defendants argue that Plaintiff's claim for declaratory judgment must be dismissed because Plaintiff "does not have a viable or timely CERCLA claim." (Dkt. No. 246-1, at 55). Plaintiff does not respond to this argument.

The Court agrees with Defendants. A claim for declaratory relief is "not an independent cause of action," *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 106 (2d Cir. 2021), and requires a "valid legal predicate," *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012). Because Defendants are entitled to summary judgment on Plaintiff's CERCLA claims, the Court dismisses Plaintiff's claim for declaratory judgment in connection with those claims. *Cf. BASF Corp. v. Albany Molecular Research, Inc.*, No. 19-cv-134, 2020 WL 705367, at *13, 2020 U.S. Dist. LEXIS 24240, at *32 (N.D.N.Y. Feb. 12, 2020) ("Since the Court has dismissed Plaintiff's [CERCLA] cost recovery claims, the Court dismisses Plaintiff's requests for declaratory relief made in connection with its § 107(a) claims."); *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 480 F. Supp. 3d 430, 444 n.6 (E.D.N.Y. 2020) ("Because the Court finds that the [complaint] does not plausibly allege a [CERCLA] section 107 claim, the Court dismisses Plaintiff's Declaratory Judgment Act claim without prejudice." (citation omitted)).

## V.   STATUS REPORT OR SUPPLEMENTAL LETTER BRIEFS

In light of the Court's ruling granting Defendants' motion for summary judgment as to Plaintiff's CERCLA claims, the parties are directed to meet and confer by April 17, 2023 regarding the status of this case and how the parties seek to proceed at this point. Specifically, the parties are directed to meet and confer regarding how they seek to proceed with the

remaining state-law claims,[22] how they seek to proceed on the issue of sanctions, and whether a mediation or settlement conference might assist a settlement in this case. The parties are directed to file a status report regarding this meet and confer conference by April 24, 2023. The parties may file a letter brief, not longer than fifteen pages, with their position by May 15, 2023. To the extent Defendants are in agreement on any issues, those should be presented in one joint letter brief. The Court will consider whether to hold a conference following receipt of these submissions.

## VI.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for spoliation sanctions (Dkt. No. 246) is **GRANTED in part**; and it is further

**ORDERED** that the Court's selection of a spoliation sanction is **DEFERRED**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 246) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's CERCLA Section 107(a) claim (Count I), CERCLA Section 113(f)(1) claim (Count II), and declaratory judgment claim (Count IV) are **DISMISSED with prejudice**; and it is further

**ORDERED** that the parties are directed to submit a status report and/or supplemental letter briefing as set forth above.

**IT IS SO ORDERED.**

Dated: <u>March 27, 2023</u>

Brenda K Sannes
Brenda K. Sannes
Chief U.S. District Judge

---

[22] Defendants requested that, if the Court granted their motion for summary judgment on Plaintiff's federal claims, that it decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. (Dkt. No. 246-1, at 55 n.37). Plaintiff did not respond to this point.